**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

HOME FOR THE AGED OF THE LITTLE SISTERS OF
THE POOR, et al.,

                              Plaintiffs,

                                                              1:21-cv-1384 (BKS/CFH)

v.

JAMES V. MCDONALD,[1] in his official capacity as
Commissioner of the New York State Department of
Health,

                              Defendant.

**Appearances:**

*For Plaintiffs:*
Cornelius D. Murray
Michael Y. Hawrylchak
Colleen R. Pierson
O'Connell & Aronowitz, P.C.
54 State Street, 9th Floor
Albany, New York 12207

*For Defendant:*
Letitia James
Attorney General of the State of New York
Shannan C. Krasnokutski
Assistant Attorney General, of Counsel
The Capitol
Albany, New York 12224

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, James V. McDonald, as Commissioner of the New York State Department of Health, is substituted for Mary T. Bassett, who was the Commissioner of the New York State Department of Health at the time Plaintiffs filed their original complaint, (Dkt. No. 1). The Clerk is respectfully directed to amend the docket accordingly.

**Hon. Brenda K. Sannes, Chief United States District Judge:**

MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiffs are 250 operators of nursing homes located in and licensed by the State of New York and three trade associations that represent such facilities. (Dkt. No. 15, ¶ 4.) Plaintiffs filed their original complaint on December 29, 2021, (Dkt. No. 1), and the operative amended complaint on February 7, 2023, (Dkt. No. 15). Plaintiffs bring this action against Defendant James V. McDonald in his official capacity as Commissioner of the New York State Department of Health asserting claims under 42 U.S.C. § 1983, the Supremacy Clause and the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1396a (the "Medicaid Act"). (*Id.* ¶¶ 1, 314–26.) Specifically, Plaintiffs assert that section 2828 of the New York Public Health Law, titled "Residential health care facilities; minimum direct resident care spending," and its implementing regulation, N.Y. Comp. Codes R. & Regs. tit. 10, § 415.34, are unconstitutional because they (1) effect an unconstitutional taking in violation of the Fifth and Fourteenth Amendments; (2) are preempted by a federal Medicare and Medicaid regulation, 42 C.F.R. § 433.51; (3) constitute an excessive fine in violation of the Eighth Amendment; (4) are arbitrary and capricious and not rationally related to a legitimate governmental purpose in violation of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments; and (5) are preempted by the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. (the "NLRA"). (Dkt. No. 15, ¶¶ 314–24.) Plaintiffs also assert a claim that the law and regulation at issue violate the Medicaid Act because the Centers for Medicare and Medicaid Services ("CMS") have not approved an amendment implementing them. (*Id.* ¶¶ 325–26.) Plaintiffs seek declaratory judgment that section 2828 and its implementing regulation are

2

unconstitutional and a permanent injunction preventing Defendant from enforcing them. (*Id.* at 187.)

Presently before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 16.) The motion is fully briefed. (Dkt. Nos. 17, 18, 19, 20, 22.) For the following reasons, the Court grants Defendant's motion to dismiss.

## II.   RELEVANT BACKGROUND[2]

### A.   Medicaid

Medicaid is a joint federal–state health insurance program established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., designed to provide medical assistance to certain needy individuals, *see id* § 1396a(a)(10). (Dkt. No. 15, ¶ 285.) States may elect to participate, and those states that do are reimbursed in part by the federal government for costs incurred under the program. (*Id.*) Federal regulations prohibit states from considering "Federal funds" as part of the state's share when requesting funding from the federal government under the Medicaid program. *See* 42 C.F.R. § 433.51(a), (c) ("Public Funds may be considered as the State's share in claiming [Federal Financial Participation] if . . . [t]he public funds are not Federal funds, or are Federal funds authorized by Federal law to be used to match other Federal funds."); *see also* (Dkt. No. 15, ¶ 305.)

Nursing homes in New York that participate in the Medicaid program must satisfy conditions for participation set forth in both federal and New York law and must execute "provider agreements" with New York. (*Id.* ¶ 286.) Violation of any of the conditions for participation related to quality of care can result in punishment—including civil monetary

---

[2] These facts are drawn from the amended complaint, (Dkt. No. 15), and, where relevant, statutory and regulatory authority. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations in the amended complaint, *see Lynch v. City of N.Y.*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3

penalties, withheld payments, or termination of participation in the Medicaid program—imposed by CMS, an agency within the United States Department of Health and Human Services. *See* 42 U.S.C. § 1396r(h); *see also* (Dkt. No. 15, ¶ 287).

Nursing homes in New York must file annual reports with the New York Department of Health ("DOH") detailing costs they have incurred during the year, including operational costs, such as direct, indirect, ancillary, and non-comparable costs, and capital costs, including interest and amortization on mortgages, lease costs, and depreciation or rental costs of movable equipment. (Dkt. No. 15, ¶ 289.) The reports must also include nursing homes' revenues and sources of revenue, such as private payors, third-party health insurers, Medicaid, or Medicare. (*Id.* ¶ 291.) The DOH uses these reports to determine, in part, the Medicaid rates to be paid to nursing homes in subsequent years. (*Id.* ¶ 290.)

Nursing homes in New York are reimbursed for services rendered under the Medicaid program at rates set by Defendant pursuant to Article 28 of the New York Public Health Law and rules and regulations promulgated by the New York Public Health and Health Planning Council ("PHHPC"), a body within the DOH responsible for, among other things, approving the establishment of nursing homes and adopting regulations governing their construction, operations, management, and the reimbursement they are to receive under the New York Medicaid program, which are set forth in Subpart 86-2 of Title 10 of the Official Compilation of Codes, Rules, and Regulations of the State of New York. (*Id.* ¶¶ 281, 288.) The rates must be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." *See* N.Y. Pub. Health Law § 2807(3); *see also* (Dkt. No. 15, ¶ 288). Under federal law, the rates must be set "to safeguard against unnecessary utilization" of services under the Medicaid program and "to assure that payments are consistent with efficiency,

economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." *See* 42 U.S.C. § 1396a(a)(30)(A); *see also* (Dkt. No. 15, ¶ 288).

As part of the New York Medicaid program, there exists the Nursing Home Quality Initiative ("NHQI"),[3] under which a pool of funds (the Nursing Home Quality Pool ("NHQP")) is established by imposing Medicaid rate reductions on eligible nursing homes. *See* N.Y. Pub. Health Law § 2808(2-c)(d); N.Y. Comp. Codes R. & Regs. tit. 10, § 86-2.42(c); *see also* (Dkt. No. 15, ¶ 292). The funds from the NHQP are redistributed to eligible nursing homes based on a system that ranks the nursing homes using scores derived from certain quality, compliance, efficiency, and satisfaction measures and categorizes each nursing home into quintiles. *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 86-2.42(b), (d). Nursing homes in the lowest two quintiles (that is, facilities receiving the lowest scores), Quintiles 4 and 5, do not receive a redistribution from the NHQP. *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 86-2.42(d)(1). Nursing homes in the highest three quintiles, Quintiles 1, 2, and 3, receive redistributions from the NHQP, with nursing homes in the highest quintile, Quintile 1, receiving the largest proportion, nursing homes in Quintile 2 receiving the next largest proportion, and nursing homes in Quintile 3 receiving the lowest proportion of the three. *See id.*; *see also* (Dkt. No. 15, ¶¶ 18, 292.)

CMS also assigns each nursing home a rating between one and five stars. (Dkt. No. 15, ¶ 20.) Five-star facilities are considered to provide much above-average-quality care; four-star facilities are considered to provide above-average-quality care; two-star facilities are considered

---

[3] Plaintiffs sometimes refer to the NHQI as the "Nursing Home Quality Improvement" program. (Dkt. No. 15, ¶ 292.)

to provide below-average-quality care; and one-star facilities are considered to provide much below-average-quality care. (*Id.*)[4]

### B.    Medicare

Medicare is a federal health insurance program designed to benefit primarily people aged 65 years and older. (Dkt. No. 15, ¶ 296.) Medicare was created by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. (Dkt. No. 15, ¶ 296.) Unlike Medicaid, Medicare is fully funded and managed by the federal government. (*Id.* ¶ 297.) And, whereas Medicaid eligibility is dependent on income, Medicare eligibility is based primarily on age. (*Id.* ¶ 298.)

Nursing homes that choose to participate in the Medicare program must execute "provider agreements" with the federal government and agree to comply with federal Medicare statutes and regulations. *See* 42 U.S.C. § 1395i-3; 42 C.F.R. pt. 483; *see also* (Dkt. No. 15, ¶ 302). Violation of these conditions for participation can result in punishment—including civil monetary penalties, withheld payments, or termination of participation in the Medicare program. *See* 42 U.S.C. § 1395i-3(h); *see also* (Dkt. No. 15, ¶ 302).[5]

Part A of the Medicare program covers skilled nursing care for limited duration resulting from illness that was preceded by at least a three-day hospital stay. (*Id.* ¶ 299.) Part B of the Medicare program provides extended coverage beyond that limited duration for certain services provided by nursing homes, such as diagnostic laboratory tests, x-rays, hospital outpatient services, and rehabilitation services. (*Id.*)

---

[4] Plaintiffs do not allege it, but three-star facilities are considered to provide average-quality care. *See* 42 C.F.R. § 423.186(a)(3)(iii).

[5] Plaintiffs also indicate that a facility that "violates, disobeys or disregards any term or provision of [Chapter 45 of the New York Public Health Law, including Article 28,] or of any lawful notice, order or regulation pursuant thereto for which a civil penalty is not otherwise expressly prescribed by law, shall be liable to the people of the state for a civil penalty" up to $10,000, *see* N.Y. Pub. Health Law § 12(1)(a), (c), and that such a violation can result in revocation of their license to operate, *see id.* § 2806. (Dkt. No. 15, ¶ 282.)

The federal government determines reimbursement rates and pays nursing homes directly for services provided under Medicare. (*Id.* ¶ 300.) These rates are calculated using a methodology that takes into account Medicare data on allowable costs, a wage-adjustment index, cost projections based on a skilled nursing market basket index, data that accounts for "relative resource utilization of different resident types," and Medicare Part B skilled nursing claims data. (*Id.* ¶ 301.)

Plaintiffs allege that payments received under the Medicare program become the property of the payee and are neither "state money" nor "trust funds." (*Id.* ¶¶ 303–04.)[6]

## C.   Challenged Statute

Section 2828 of the New York Public Health Law was signed into law on April 19, 2021, and, as relevant here, amended on April 9, 2022, retroactive to April 1, 2022 ("2022 Amendments"). (Dkt. No. 15, ¶¶ 8, 10.)[7] Section 2828 creates a "Spending Mandate." The Spending Mandate requires that, beginning on January 2, 2022:

> [E]very residential health care facility shall spend a minimum of seventy percent of revenue on direct resident care, and forty percent of revenue shall be spent on resident-facing staffing, provided that amounts spent on resident-facing staffing shall be included as a part of amounts spent on direct resident care.

---

[6] Plaintiffs similarly allege that reimbursement payments that they receive from private-pay patients or from third-party health insurance companies for patients who have purchased such insurance to cover their care in a nursing home "are neither state nor federal funds, and when paid to the nursing homes become the private property of those facilities." (*Id.* ¶ 284.) Plaintiffs' citation of *U.S. ex rel. Quartararo v. Catholic Health System of Long Island Inc.*, 84 F.4th 126 (2d Cir. 2023), for the related proposition that "nursing homes receiving Medicaid or Medicare funds for past services already rendered have 'no obligation to spend the reimbursement funds in any particular way,'" (Dkt. No. 19, at 1 (citation omitted); Dkt. No. 20, at 1 (citation omitted)), is misplaced. In *Quartararo*, the Second Circuit held that a former employee of a nursing home could not bring claims under the False Claims Act, 31 U.S.C. § 3729 et seq., and a similar state law because the nursing home, which used funds from Medicaid and Medicare reimbursements to pay for utility, payroll, and other ancillary expenses, did not run afoul of the Benefits Conversion Statute, 42 U.S.C. § 1320a-7b(a)(4). *See* 84 F.4th at 130–32. The statutory bases for the claims in *Quartararo* are not implicated here, and *Quartararo* is plainly inapposite.

[7] Certain other provisions of section 2828 about which Plaintiffs do not complain were amended on December 22, 2023. *See* S.6897, 205th Leg., 2023–24 Legis. Sess. (N.Y. 2023).

N.Y. Pub. Health Law § 2828(1)(a); *see also* (Dkt. No. 15, ¶ 9(a)). The Spending Mandate

further requires:

> Fifteen percent of costs associated with resident-facing staffing
> contracted out by a facility for services provided by registered
> professional nurses or licensed practical nurses . . . or certified nurse
> aides . . . shall be deducted from the calculation of the amount spent
> on resident-facing staffing and direct resident care.

N.Y. Pub. Health Law § 2828(1)(b); *see also* (Dkt. No. 15, ¶ 9(d)).[8] Neither of these provisions

of the Spending Mandate was altered by the 2022 Amendments. *See* S.8007C, 204th Leg., 2021–

22 Legis. Sess. (N.Y. 2022); *see also* (Dkt. No. 15, ¶ 11).

Section 2828 also directs the DOH to promulgate regulations involving disposition of

excess revenue (the "Excess-Revenue Cap"). In effect, the Excess-Revenue Cap, as described by

section 2828, requires the DOH to promulgate regulations that, "at a minimum," prevent any

residential health care facility's "total operating revenue [from] exceed[ing] total operating and

non-operating expenses by more than five percent of total operating and non-operating

expenses." *See* N.Y. Pub. Health Law § 2828(1)(c)(i).[9]

Section 2828 further requires that the DOH promulgate regulations for the recoupment of

funds not spent in compliance with the Spending Mandate or Excess-Revenue Cap:

> [A]ny residential health care facility . . . that fails to [comply with
> the Spending Mandate or Excess-Revenue Cap] . . . shall remit . . .
> such excess revenue, or the difference between the minimum
> spending requirement and the actual amount of spending on
> resident-facing staffing or direct care staffing, as the case may be, to
> the state, with such excess revenue which shall be payable, in a
> manner to be determined by such regulations, by November first in
> the year following the year in which the expenses are incurred.

---

[8] Plaintiffs allege that "in every month since September 2021 Governor Kathy Hochul has declared a statewide healthcare staffing emergency to be in effect for all healthcare facilities." (Dkt. No. 15, ¶ 9(d).)

[9] The provisions of section 2828(1)(c)(i) were originally in section 2828(c)(1), *see* S.2507C, 204th Leg., 2021–22 Legis. Sess. (N.Y. 2021), and remained so after the 2022 Amendments, *see* S.8007C, 204th Leg., 2021–22 Legis. Sess. (N.Y. 2022). However, section 2828(c)(1) was further subdivided by amendment in 2023, and the relevant provision is now contained in section 2828(c)(1)(i). *See* S.6897, 205th Leg., 2023–24 Legis. Sess. (N.Y. 2023).

*Id*. As enacted in 2021, section 2828(1)(c) required that these compliance measures—as to both the Spending Mandate and the Excess-Revenue Cap—be "calculated on an annual basis." *See* S.2507C, 204th Leg., 2021–22 Legis. Sess. (N.Y. 2021). As amended in 2022, section 2828(1)(c) mandates that compliance with the Spending Mandate and Excess-Revenue Cap be calculated on an annual basis except for the year 2022, for which the calculation is to be on a "pro-rata basis for only that portion of [2022] during which the failure of a residential health care facility to spend a minimum of seventy percent of revenue on direct resident care, and forty percent of revenue on resident-facing staffing, may be held to be a violation of this chapter." *See* N.Y. Pub. Health Law § 2828(1)(c)(i); *see also* S.8007C, 204th Leg., 2021–22 Legis. Sess. (N.Y. 2022); (Dkt. No. 15, ¶ 11(b)).

Section 2828 also describes the methods by which the DOH "shall collect" payments from residential health care facilities under the section, which "includ[e], but [are] not limited to, bringing suit in a court of competent jurisdiction on its own behalf after giving notice of such suit to the attorney general, [and] deductions or offsets from payments made pursuant to the Medicaid program." N.Y. Pub. Health Law § 2828(1)(c)(i). Section 2828 dictates where the DOH will place the recouped funds:

> [The DOH] shall deposit such recouped funds into the nursing home quality pool . . . . Provided further that such payments of excess revenue shall be in addition to and shall not affect a residential health care facility's obligations to make any other payments required by state or federal law into the nursing home quality pool, including but not limited to medicaid [sic] rate reductions required . . . .

*Id.* (citing N.Y. Public Health Law § 2808(2-c)(d), (g)).

As relevant here, section 2828, as amended, defines "revenue" as "total operating revenue from or on behalf of residents of the residential health care facility, government payers,

or third-party payers, to pay for a resident's occupancy of the residential health care facility,

resident care, and the operation of the residential health care facility" but lists certain exclusions

from that definition. *See id.* § 2828(2)(a). Section 2828 also defines certain other terms,

including "expenses," "direct resident care," "resident-facing staffing," and "cost report," *see id.*

§ 2828(2)(b)–(e), and provides a list of facilities excluded from the term "residential health care

facilities," *see id.* § 2828(3).

      Section 2828 also creates a waiver process:

> [Defendant] may waive the requirements of this section on a case-by-case basis with respect to a nursing home that demonstrates to [Defendant]'s satisfaction that it experienced unexpected or exceptional circumstances that prevented compliance. [Defendant] may also exclude from revenues and expenses, on a case-by-case basis, extraordinary revenues and capital expenses, incurred due to a natural disaster or other circumstances set forth by [Defendant] in regulation. At least thirty days before any action by [Defendant] under this subdivision, [Defendant] shall transmit the proposed action to the state office of the long-term care ombudsman and the chairs of the senate and assembly health committees, and post it on the [DOH]'s website.

*Id.* § 2828(4). And finally, section 2828 states that "[Defendant] shall issue regulations, seek

amendments to the state plan for medical assistance, seek waivers from [CMS], and take such

other actions as reasonably necessary to implement this section." *Id.* § 2828(5).

      On June 30, 2022, Defendant filed a proposed State Plan Amendment ("SPA") seeking

approval of the implementation of section 2828 with CMS as required by section 2828. *See id.*;

*see also* (Dkt. No. 15, ¶ 14.) As of Plaintiffs' filing of the amended complaint, CMS had not yet

approved or disapproved the proposed SPA. (Dkt. No. 15, ¶ 15.)

      **D.**    **Implementing Regulation**

      On November 17, 2022, the PHHPC adopted a regulation, N.Y. Comp. Codes R. & Regs.

tit. 10, § 415.34, to implement the provisions of section 2828, including the Spending Mandate

and the Excess-Revenue Cap, retroactively to April 1, 2022. (Dkt. No. 15, ¶ 12.)[10] Pursuant to

section 2828, the regulation provides:

> By January 1, 2022, residential health care facilities shall comply
> with the following minimum expenditures:
> (1) 70 percent of revenue shall be spent on direct resident care; and
> (2) 40 percent of revenue shall be spent on resident-facing staffing.
> (i) All amounts spent on resident-facing staffing shall be included as
> a part of amounts spent on direct resident care; and
> (ii) 15 percent of costs associated with resident-facing staffing that
> are contracted out by a facility for services provided by registered
> professional nurses, licensed practical nurses, or certified nurse
> aides shall be deducted from the calculation of the amount spent on
> resident-facing staffing and direct resident care.

N.Y. Comp. Codes R. & Regs. tit. 10, § 415.34(d)(1)–(2). The regulation further provides, in

satisfaction of the directive of section 2828, for recoupment by the DOH of "excessive total

operating revenue" where "the facility's total operating revenue exceeds total operating and non-

operating expenses by more than five percent of total operating revenue" or "the facility fails to

spend the minimum amount necessary to comply with the minimum spending standards for

resident-facing staffing or direct resident care, as set forth in subdivision (d) of this Section, as

calculated on an annual basis, or for 2022, on a pro-rata basis for April 1, 2022 through

December 31, 2022." *Id.* § 415.34(e)(1). The regulation dictates in the event of noncompliance:

> (i) [The DOH] shall issue a notice of noncompliance to a facility
> subject to recoupment for excessive total operating revenue, which
> indicates the amount to be remitted based on the amount of excess
> revenue or the difference between the minimum spending
> requirement and the actual amount of spending on resident-facing
> staffing or direct care staffing, as applicable, as well as acceptable
> forms of payment.
> (ii) Upon receipt of a notice of noncompliance pursuant to
> subparagraph (i), the facility shall remit the total amount indicated
> in the notice of noncompliance by November first in the year
> following the year in which the expenses are incurred.

---

[10] The Court notes that the regulation states its effective date is December 7, 2022. *See* N.Y. Comp. Codes R. & Regs.
tit. 10, § 415.34.

*Id.* § 415.34(e)(2). Penalties for failure to remit the total required fee under the regulation by the due date "includ[e] but [are] not limited to" a lawsuit by DOH, "deductions or offsets from payments made pursuant to the Medicaid program, and imposition of penalties pursuant to Section 12 of the Public Health Law." *Id.* § 415.34(e)(3). Funds recouped by the DOH under the regulation "shall be deposited by the [DOH] into the [NHQP], pursuant to Section 2808(2-c)(d) of the Public Health Law." *Id.* § 415.34(e)(4).[11]

The regulation also clarifies the waiver provision of section 2828 by indicating what information a waiver applicant must provide:

> A facility may apply to the Commissioner for a waiver of applicability of this Section on the basis of unexpected or exceptional circumstances that prevented compliance. Such application shall detail the specific unexpected or exceptional circumstance experienced by the facility; when the facility first learned of such circumstances; why the facility could not have anticipated such circumstances arising; actions the facility took to address such circumstances; expenses incurred as a result of addressing such circumstances; when the facility expects such circumstances to be resolved; and what preventive steps the facility is taking to ensure that such circumstances do not unexpectedly arise in the future. The Commissioner shall have discretion to approve or reject applications submitted pursuant to this paragraph, and shall provide the facility with the basis for the Commissioner's determination within a reasonable timeframe upon receipt of a complete application.

*Id.* § 415.34(c)(2). In determining whether to grant or deny a waiver application based on unexpected or exceptional circumstances, factors Defendant will assess include, but are not limited to "whether the facility should have anticipated such events occurring"; "whether any other residential health care facilities licensed by the Department experienced similar

---

[11] Section 2808(2-c)(d), as amended, reads in relevant part: "For purposes of facilitating quality improvements through the establishment of a nursing home quality pool to be funded at the discretion of the commissioner by (i) adjustments in medical assistance rates, (ii) funds made available through state appropriations, or (iii) a combination thereof . . . ."

circumstances but have not applied for a waiver under this paragraph"; and "whether the facility has implemented sufficient policies and procedures to ensure such events do not recur." *Id.* § 415.34(c)(2)(i)–(iii). Furthermore, "[f]or the purposes of assessing whether a facility has met the minimum spending requirements," the facility may apply to Defendant "to have certain revenues and expenses excluded from the calculation of the facility's total revenue and total expenditures" provided that the facility demonstrates to Defendant that the revenues and expenses were incurred due to "a natural disaster, where a federal, State, or local declaration of emergency has been issued" or "the facility has received extraordinary, non-recurring revenue which, in the discretion of [Defendant], does not accurately reflect operating revenue for the purposes of this rule, including but not limited to revenue received through insurance or legal settlements." *See id.* § 415.34(d)(3).

The regulation also defines certain terms, including "contracted out," "direct resident care," "resident-facing staffing," and "revenue," and provides a list of facilities excluded from the term "residential health care facilities" as used in the regulation. *See id.* § 415.34(b), (c)(1).[12]

### E.     Plaintiffs

Plaintiffs are 250 operators of nursing homes, also known as "residential health care facilities" as defined in New York Public Health Law, N. Y. Pub. Health Law § 2801(2)–(3), located in and licensed by the State of New York and three trade associations that represent such facilities. (Dkt. No. 15, ¶¶ 4, 280.) The nursing-home Plaintiffs have participated at all relevant times and continue to participate in the Medicaid and Medicare programs. (*Id.*) The nursing-home Plaintiffs "are reimbursed for the services they provide their patients in a variety of ways,

---

[12] The regulation also provides for a waiver of applicability "on the basis of providing specialty care services." *See id.* § 415.34(c)(1)(iii).

depending on the status of their patients, and more specifically, whether they are (a) private-pay, (b) covered by private third party health insurance, (c) eligible for care under the New York State Medicaid program, (d) eligible for care under the Federal Government's Medicare program, or (e) dually eligible for both Medicare and Medicaid." (*Id.* ¶ 283.) Plaintiffs allege that they incur financial losses from participation in New York's Medicaid program and therefore "rely on private-pay patients, third party private health insurance payors, and/or the Medicare program to sustain their operations." (*Id.* ¶ 295.)

Plaintiffs have not alleged that they have been fined or otherwise penalized for noncompliance with section 2828 and its implementing regulation. Nor have Plaintiffs alleged that they have paid any recoupment under section 2828 and its implementing regulation, received notices of noncompliance, *see* N.Y. Comp. Codes R. & Regs. tit. 10, § 415.34(e)(2)(i), or applied for waivers, *see id.* §§ 415.34(c)(2), (d)(3). Plaintiffs have, however, alleged the amounts that would have been recoupable by the DOH under section 2828 and its implementing regulation for each nursing-home Plaintiff in 2019 and 2020 had section 2828 and its implementing regulation—which went into effect in 2022—been in effect during those years. (Dkt. No. 15, ¶¶ 26–275; Dkt. No. 15-1.)

Plaintiffs allege no amount would have been recoupable in 2019 or 2020 for forty-nine of the 250 nursing-home Plaintiffs. (Dkt. No. 15, ¶¶ 227–75; Dkt. No. 15-1.) Of the 250 nursing-home Plaintiffs, 173 would have been subject to recoupment under either the Spending Mandate or the Excess-Revenue Cap in 2019, and either 108 or 109[13] would have been subject to recoupment under either the Spending Mandate or the Excess-Revenue Cap in 2020. (Dkt. No.

---

[13] Plaintiffs allege in paragraph 17 of the amended complaint that this figure is 108, (Dkt. No. 15, ¶ 17), but their exhibit presenting a spreadsheet of the relevant data suggests the figure is 109, (Dkt. No. 15-1).

15, ¶¶ 16–17; Dkt. No. 15-1.) Of the 250 nursing-home Plaintiffs, eighty-one would have been subject to recoupment under either the Spending Mandate or the Excess-Revenue Cap in both 2019 and 2020. (Dkt. No. 15-1.) Plaintiffs allege that, had section 2828 and the implementing regulation been in effect in 2019 and 2020, Plaintiffs would have collectively owed approximately $219 million under the Spending Mandate and $55 million under the Excess-Revenue Cap in 2019 and $107 million under the Spending Mandate and $39 million under the Excess-Revenue Cap in 2020. (Dkt. No. 15, ¶¶ 16–17.) Plaintiffs also allege that the eighty-three nursing-home Plaintiffs ranked in the top three quintiles under the NHQI program (and therefore eligible for reimbursement from the NHQP) in 2019 would have owed approximately $132 million under both the Spending Mandate and the Excess-Revenue Cap in that year and that the fifty-five nursing-home Plaintiffs ranked in the top three quintiles under the NHQI program in 2020 would have owed approximately $69 million under both the Spending Mandate and the Excess-Revenue Cap in that year. (*Id.* ¶ 19.) Plaintiffs further allege that the sixty nursing-home Plaintiffs who had a four- or five-star rating under the CMS program in 2019 would have owed approximately $121 million under both the Spending Mandate and the Excess-Revenue Cap in that year and that the forty-two nursing-home Plaintiffs who had a four- or five-star rating under the CMS program in 2020 would have owed approximately $67 million under both the Spending Mandate and the Excess-Revenue Cap in that year. (*Id.* ¶ 21.)

## III.   STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation

of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of N.Y.*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## IV.   ANALYSIS[14]

### A.   Takings

Plaintiffs allege that section 2828 and its implementing regulation effect an unconstitutional taking under the Fifth and Fourteenth Amendments. (Dkt. No. 15, ¶¶ 314–15.) Defendant argues that Plaintiffs have failed "to allege regulatory action rising to the level of a constitutional taking." (Dkt. No. 16-1, at 12–14.) Plaintiffs argue that Defendant misconstrues their claim as alleging a regulatory taking and that section 2828 and its implementing regulation effect an unconstitutional *physical* taking, or, absent such a finding, that section 2828 and its implementing regulation nevertheless effect an unconstitutional regulatory taking. (Dkt. No. 17, at 14–17.)

---

[14] Plaintiffs purport to bring their claims facially and as applied. (Dkt. No. 15, ¶ 4.) But "it is not the label that matters in deciding what standard applies." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 126 (2d Cir. 2014) (citing *Doe v. Reed*, 561 U.S. 186, 194 (2010)). Thus, where applicable, the Court will examine Plaintiffs' allegations relevant to each claim to determine whether Plaintiffs assert facial or as-applied challenges. Where Plaintiffs fail to state an as-applied challenge, any associated facial challenge necessarily fails as well. *See Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008) ("Because plaintiffs have failed to plead facts establishing that [the challenged law] is unconstitutional as applied to them, they necessarily fail to state a facial challenge, which requires them to 'establish that no set of circumstances exists under which the [statute] would be valid.'" (second alteration in original) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003))).

The Takings Clause of the Fifth Amendment to the United States Constitution provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the states through the Fourteenth Amendment. *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 261 (2d Cir. 2014) (citing *Kelo v. City of New London*, 545 U.S. 469, 472 n.1 (2005)). "The Supreme Court has recognized two branches of Takings Clause cases: physical takings and regulatory takings." *Id.* at 263 (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)). A physical taking occurs when the government physically acquires private property for a public use, such as by using its power of eminent domain to formally condemn property, physically taking possession of property without acquiring title to it, or otherwise occupying property (for example, by flooding property as a result of building a dam). *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citations omitted). "These sorts of physical appropriations constitute the 'clearest sort of taking,'" and in such instances, a per se taking rule applies: "The government must pay for what it takes." *See id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)).

"A regulatory taking, by contrast, occurs where even absent a direct physical appropriation, governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'" *1256 Hertel Ave.*, 761 F.3d at 261 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)). A regulatory taking may be categorical or noncategorical. *See id.* at 264; *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014). "A categorical taking occurs in 'the extraordinary circumstance when no productive or economically beneficial use of land is permitted.'" *Sherman*, 752 F.3d at 564 (quoting *Tahoe–Sierra*, 535 U.S. at 330). "'Anything less than a complete elimination of value, or a total loss,' is a non-categorical taking,

which is analyzed under the framework created in *Penn Central Trans. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978)." *Sherman*, 752 F.3d at 564 (quoting *Tahoe–Sierra*, 535 U.S. at 330). A categorical taking, however, is a per se taking, *see 1256 Hertel Ave.*, 761 F.3d at 261, and as such, the per se rule that the "government must pay for what it takes" applies without need for analysis of the *Penn Central* factors, *see Cedar Point Nursery*, 141 S. Ct. at 2071–72.

### 1.    Physical Taking

Plaintiffs chiefly argue that section 2828 and its implementing regulation effect a per se physical taking. (Dkt. No. 17, at 14–15.) Defendant argues that, "[w]hile money may be the subject of a physical taking," where, as here, seized funds are not traceable to a specific, identifiable property interest, such a seizure does not amount to a physical taking. (Dkt. No. 18, at 6–7.) The Court agrees with Defendant.

"When the government effects a physical appropriation of private property for itself or another—whether by law, regulation, or another means—a per se physical taking has occurred." *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 550 (2d Cir. 2023). Physical takings "are relatively rare[ and] easily identified." *Tahoe-Sierra*, 535 U.S. at 324. "The paradigmatic [physical] taking requiring just compensation is a . . . physical invasion of private property." *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). But "when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a '*per se* [takings] approach' is the proper mode of analysis under the Court's precedent." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 614 (2013) (alteration in original) (quoting *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (2003)).

Here Plaintiffs argue that section 2828 and its implementing regulation "mandate[] the physical taking of revenue and excess profit from Plaintiffs, amounting to "a per se physical taking." (Dkt. No. 17, at 15.) Plaintiffs rely primarily on *Cedar Point Nursery*, but that case is clearly inapposite. The alleged taking in *Cedar Point Nursery* involved the brief physical occupation of private agricultural land by labor organizers. *See Cedar Point Nursery*, 141 S. Ct. at 2069. In that case, the Supreme Court held that "government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are . . . *per se* physical takings." *Id.* at 2074. Such circumstances of physical invasion of real property are clearly not present here. *See*, *e.g.*, *Cmty. Hous. Improvement Program,* 59 F.4th at 551–53 (noting that the New York City Rent Stabilization Law, which capped rent increases and limited the grounds for evictions, was "readily distinguishable" from the regulations in *Cedar Point Nursery* that "compel[ed] invasions of property closed to the public" and rejecting the plaintiff landlords' argument that the rent-stabilization law effected a physical taking).

To be sure, appropriation of certain funds, such as those associated with a specific, identifiable piece of real property or linked to a specific, identifiable bank account, may constitute a physical taking. *See, e.g.*, *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 240 (2003) ("A law that requires that the interest on [client funds in an Interest on Lawyers' Trust Account ('IOLTA')] be transferred to a different owner for a legitimate public use . . . could be a *per se* taking requiring the payment of 'just compensation' to the client."); *Koontz*, 570 U.S. at 613, 615 (holding that a regulation requiring a landowner to spend money "to make improvements to public lands that are nearby . . . amount[s] to a *per se* taking" because "the monetary obligation burdened [the landowner]'s ownership of a specific parcel of land"); *Armstrong v. United States*, 364 U.S. 40, 48 (1960) ("We hold that there was a taking of [liens on boat-building materials] for

which just compensation is due under the Fifth Amendment."). But here, Plaintiffs have not alleged a link between monies owed and any specific, identifiable real property interest or any specific identifiable fund of money such that section 2828 and its implementing regulation constitute a per se physical taking. *See, e.g.*, *Ballinger v. City of Oakland*, 24 F.4th 1287, 1295 (9th Cir. 2022) (holding that a city ordinance which "imposes a general obligation to pay [relocation] money [to certain tenants] and does not identify any specific fund of money . . . does not effect an unconstitutional physical taking"); *McCarthy v. City of Cleveland*, 626 F.3d 280, 285 (6th Cir. 2010) ("[A]ll circuits that have addressed the issue have uniformly found that a taking does not occur when the statute in question imposes a monetary assessment that does not affect a specific interest in property." (collecting cases)). Accordingly, the Court finds that Plaintiffs have failed to plausibly allege that section 2828 and its implementing regulation effect a per se physical taking.

## 2.    Regulatory Taking

Plaintiffs next argue that, even if section 2828 and its implementing regulation do not effect an unconstitutional physical taking, they effect an unconstitutional regulatory taking. (Dkt. No. 17, at 15–17.)[15] Defendant argues that, under the factors set forth in *Penn Central*, Plaintiffs have not alleged an unconstitutional regulatory taking. (Dkt. No. 16-1, at 12–14; Dkt. No. 18, at 7–8.)

"The Supreme Court has 'generally eschewed any set formula' for identifying regulatory takings, instead 'preferring to engage in essentially ad hoc, factual inquiries' to determine in each case whether the challenged property restriction rises to the level of a taking." *See 1256 Hertel*

---

[15] Plaintiffs do not argue that section 2828 and its implementing regulation effect a categorical regulatory taking. *See 1256 Hertel Ave.*, 761 F.3d at 264 ("The cases in which the Supreme Court has applied [the categorical takings] rule have involved real property, and it is unclear whether that . . . *per se* rule should be applied to purported takings of other types of property."). Therefore, the Court does not address categorical regulatory takings here.

*Ave.*, 761 F.3d at 264 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)). Such

a determination relies on the factors set forth in *Penn Central*, which include "(1) the economic

impact of the regulation on the claimant; (2) the extent to which the regulation has interfered

with distinct investment-backed expectations; and (3) the character of the governmental action."

*Sherman*, 752 F.3d at 565 (2d Cir. 2014) (quoting *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362,

375 (2d Cir. 2006)); *see also Penn Central*, 438 U.S. at 124.

"To prevail on a facial challenge, the plaintiff must 'establish that no set of circumstances

exists under which the [challenged law] would be valid.'" *Cmty. Hous. Improvement Program*,

59 F.4th at 548 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "In other words,

the plaintiff must show that the statute 'is unconstitutional in all of its applications.'" *Id.* (quoting

*Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 449 (2008)). In light of the *Penn*

*Central* factors, Plaintiffs have not plausibly alleged that section 2828 and its implementing

regulation effect a facially unconstitutional regulatory taking.

As to the first *Penn Central* factor, Plaintiffs attach as exhibits to their amended

complaint spreadsheets "that show just how much of their own funds will be confiscated," (Dkt.

No. 17, at 17; Dkt. Nos. 15-1, 15-2, 15-3, 15-4, 15-5). While these spreadsheets demonstrate that

section 2828 and its implementing regulation "may well have an appreciable economic impact

on the profitability of some [nursing homes] subject to [their] provisions," Plaintiffs "have

simply not plausibly alleged that *every* owner of a [nursing home] has suffered an adverse

economic impact that would support their facial regulatory takings claims." *See Cmty. Hous.*

*Improvement Program*, 59 F.4th at 554 (emphasis added). To wit, seventy-seven Plaintiffs would

not have been impacted by section 2828 and its implementing regulation in 2019 and 141

Plaintiffs would not have been impacted by section 2828 and its implementing regulation in

2020. (Dkt. No. 15-1.) Thus, Plaintiffs "do not establish that [section 2828 and its implementing regulation] can never be applied constitutionally, which is the requirement for a facial challenge," because the spreadsheets demonstrate that section 2828 and its implementing regulation may well have no economic impact on some nursing homes. *See Cmty. Hous. Improvement Program*, 59 F.4th at 554. In any event, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *See Greater Chautauqua Fed. Credit Union v. Marks*, 2023 WL 2744499, at *12, 2023 U.S. Dist. LEXIS 57087, at *26 (S.D.N.Y. Mar. 31, 2023) (quoting *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.,* 508 U.S. 602, 645 (1993)). Therefore, Plaintiffs have failed to plausibly allege that the first *Penn Central* factor demonstrates that section 2828 and its implementing regulation effect an unconstitutional regulatory taking.

As to the second Penn Central factor, Plaintiffs' amended complaint makes no mention, let alone a plausible allegation, of interference with any reasonable investment-backed expectations. *See Lebanon Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 401 (N.D.N.Y. 2020) ("By omitting discussion of investment-backed expectations, 'the pleading fails to plausibly allege a taking under this factor.'" (quoting *Kabrovski v. City of Rochester*, 149 F. Supp. 3d 413, 425 (W.D.N.Y. 2015))). Plaintiffs argue that their amended complaint is not "devoid of any such allegation" because it includes exhibits "that show just how much of their own funds will be confiscated." (Dkt. No. 16 (quoting *Lebanon Valley Auto Racing*, 478 F. Supp. 3d at 401).) But the exhibits do not demonstrate any investments or expectations on which Plaintiffs or any other stakeholders "made business decisions," *see Greater Chautauqua Fed. Credit Union*, 2023 WL 2744499, at *13, 2023 U.S. Dist. LEXIS 57087, at *28, or that Plaintiffs "bought their property in reliance on a state of affairs that did not include the challenged

regulatory regime," *see Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (quoting *Loveladies Harbor v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994)). Nor do Plaintiffs allege facts plausibly suggesting that section 2828 and its implementing regulation will prevent them from "realizing a financial return on their properties[] or that the value of their propert[ies] will be severely reduced." *See Lebanon Valley Auto Racing*, 478 F. Supp. 3d at 401.[16] And even assuming that "some [nursing-home] owners . . . had their investment-backed expectations thwarted by" section 2828 and its implementing regulation, for the same reason that Plaintiffs have "not plausibly alleged that every owner of a [nursing home] has suffered an adverse economic impact," Plaintiffs have not plausibly alleged that section 2828 and its implementing regulation "interfere[] with every [nursing-home] owner's investment-backed expectations, which is required on a facial challenge." S*ee Cmty. Hous. Improvement Program*, 59 F.4th at 554.[17] Therefore, Plaintiffs have failed to plausibly allege that the second *Penn Central* factor demonstrates that section 2828 and its implementing regulation effect an unconstitutional regulatory taking.

Finally, as to the third *Penn Central* factor, a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government than

---

[16] While Plaintiffs argue that the amounts demonstrated in Exhibit A "show just how much of their own funds will be confiscated," (Dkt. No. 16 (quoting *Lebanon Valley Auto Racing*, 478 F. Supp. 3d at 401), Plaintiffs have not alleged, for instance, gross revenue or operating and nonoperating expenses that would allow the Court to assess the overall financial impact of recoupment.

[17] Any investment-backed expectation would also necessarily be tempered by the highly regulated nature of Plaintiffs' industry. *See Blue v. Koren*, 72 F.3d 1075, 1084–85 (2d Cir. 1995) ("Nursing homes are a highly regulated industry . . . ."); *Daniel v. N.Y.S. Dep't of Health*, No. 21-cv-4097, 2022 WL 21781460, at *15, 2022 U.S. Dist. LEXIS 155479, at *40 (E.D.N.Y. Aug. 27, 2022) ("Plaintiff [provided services] under the Medicaid program and was aware that it is a heavily regulated business."); *see also Cmty. Hous. Improvement Program*, 59 F.4th at 555 ("Given the [rent-stabilizing law]'s ever-changing requirements, no property owner could reasonably expect the continuation of any particular combination of [rent-stabilizing law] provisions. As the New York Court of Appeals has noted, 'no party doing business in a regulated environment like the New York City rental market can expect the [rent-stabilizing law] to remain static.'" (quoting *Matter of Regina Metro. Co., LLC v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 369 (2020))).

when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Lebanon Valley Auto Racing*, 478 F. Supp. 3d at 402 (quoting *Penn Central*, 438 U.S. at 124). "The Supreme Court has instructed that in analyzing the 'character' of the governmental action, courts should focus on the extent to which a regulation was 'enacted solely for the benefit of private parties' as opposed to a legislative desire to serve 'important public interests.'" *74 Pinehurst LLC v. New York*, 59 F.4th 557, 568 (2d Cir. 2023) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987)). "[T]he historic police powers of the State include the regulation of matters of health and safety," *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 506 n.8 (2d Cir. 2014) (quoting *DeBuono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997)); *see also Attoma v. State Dep't of Soc. Welfare*, 270 N.Y.S.2d 167, 171 (App. Div. 1966) ("[T]he operation of so-called nursing homes bears a reasonable relation to the health, safety and welfare of a community and is subject to licensing and regulation as a valid exercise of the police power."). And "it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *1256 Hertel Ave.*, 761 F.3d at 265 (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986)).

Here, Plaintiffs do not meaningfully dispute that the program imposed by section 2828 and its implementing regulation merely "adjust[s] the benefits and burdens of economic life to promote the common good," *Lebanon Valley Auto Racing*, 478 F. Supp. 3d at 402 (quoting *Penn Central*, 438 U.S. at 124), by governing an area of "broad public interests," *see Cmty. Hous. Improvement Program*, 59 F.4th at 555. In arguing otherwise, Plaintiffs rely on *York Hospital* for the proposition that they have a property interest in Medicare payments and that the taking of such property is subject to scrutiny under the Takings Clause. (Dkt. No. 17, at 17 (quoting *York*

*Hosp. v. Me. Health Care Fin. Comm'n*, 719 F. Supp. 1111, 1121 (D. Me. 1989)). But, as Defendant points out, the court in *York Hospital* found "no entitlement on the part of Plaintiffs to 'profits' from its administration of care under the Medicare Act." *See* 719 F. Supp. at 1121. The court went on to hold that, "[a]bsent legal entitlement to specific profits, there can be no property interest, and thus, no taking." *See id.* Here, the Court has already determined that Plaintiffs have failed to plausibly allege a "physical invasion," and Plaintiffs provide no other argument as to how the third *Penn Central* factor weighs in their favor. It does not. Rather, section 2828 and its implementing regulation reflect a "legislative desire to serve 'important public interests,'" *see 74 Pinehurst*, 59 F.4th at 568 (quoting *Keystone Bituminous Coal*, 480 U.S. at 485–86), namely, assurance of quality care in nursing homes licensed by and operating in New York. *See* 44 N.Y. Reg. 24–25 (Aug. 10, 2022) ("The legislative objective of PHL § 2828 is to . . . help ensure a high quality of resident care. . . . It will . . . improve the safety and quality of life for all long-term care residents in New York State.").

In sum, because Plaintiffs have failed to demonstrate that any *Penn Central* factor weighs in their favor, Plaintiffs have failed to plausibly allege that section 2828 and its implementing regulation effect a facially unconstitutional regulatory taking.

Additionally, to the extent Plaintiffs bring an as-applied regulatory takings claim, it is dismissed as unripe. "Ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts," *Mendez v. Banks*, 65 F.4th 56, 60, 61 (2d Cir. 2023) (quoting *Nutritional Health All. v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998)), that is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements,'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Lab'ies v. Gardner*, 387 U.S. 136, 148–149 (1967)). Although neither of the

parties raised the issue of ripeness concerning Plaintiffs' takings claim, the Court is obligated to consider it sua sponte. *See Nutritional Health All.*, 144 F.3d at 225 (citations omitted); *see also Corsello v. Verizon N.Y., Inc.*, 976 F. Supp. 2d 354, 358 (E.D.N.Y. 2013) ("If subject matter jurisdiction is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action sua sponte." (quoting *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009))), *aff'd sub nom. Kurtz v. Verizon N.Y., Inc.*, 758 F.3d 506 (2d Cir. 2014), *abrogated on other grounds by Knick v. Township of Scott*, 139 S. Ct. 2162 (2019).

A takings claim is not ripe until the "government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 294 (2d Cir. 2022) (citation omitted)). That is, "'a plaintiff's failure to properly pursue administrative procedures may render a claim unripe if avenues still remain for the government to clarify or change its decision,' including where the plaintiff has 'an opportunity to seek a variance.'" *74 Pinehurst*, 59 F.4th at 565 (quoting *Pakdel v. City and County of San Francisco*, 141 S. Ct. 2226, 2231 (2021)). And "[w]hile a property owner 'has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it,' a claim that a regulation effects an as-applied taking cannot be properly adjudicated until there is 'no question . . . about how the regulations at issue apply to the particular [property] in question.'" *Id.* (second and third alterations in original) (first quoting *Knick*, 139 S. Ct. at 2170, and then quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997)).

Here, Plaintiffs have alleged neither that they have received any notices of recoupment from the DOH nor that they have sought waivers. Therefore, Plaintiffs' as-applied regulatory

takings claim is dismissed as unripe. *See id.* ("[W]e hold that [the plaintiff]'s regulatory takings claims are unripe where, as here, the relevant parties have failed to pursue available administrative relief.").

Accordingly, Defendant's motion to dismiss is granted with respect to Plaintiffs' takings claim.

### B.    Federal Preemption

Plaintiffs allege that section 2828 and its implementing regulation are preempted by federal law. (Dkt. No. 15, ¶¶ 316–17, 323–24.) Specifically, Plaintiffs allege that section 2828 and its implementing regulation violate the Supremacy Clause by conflicting with 42 C.F.R. § 433.51 and the NLRA. (*Id.* ¶¶ 317, 324.)

The laws of the United States are the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Therefore, "state laws that conflict with federal law are 'without effect.'" *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). In other words, "state laws that require a private party to violate federal law are pre-empted." *Id.* at 475 (quoting *Maryland*, 451 U.S. at 746). A state law is pre-empted when (1) Congress has defined "explicitly the extent to which its enactments pre-empt state law . . . through explicit statutory language"; (2) the state law at issue "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively"; or (3) the state law at issue "actually conflicts with federal law . . . [so that] it is impossible for a private party to comply with both state and federal requirements." *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990). "It has long been settled . . . that [courts] presume federal statutes do not . . . preempt state law." *Bond v. United States*, 572 U.S. 844, 858 (2014) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

1.      **42 C.F.R. § 433.51**

Plaintiffs allege that section 2828 and its implementing regulation "violate the

Supremacy Clause of the U.S. Constitution to the extent that they include in the calculation of

the 70% / 40% spending requirements the revenue received by the Plaintiff nursing homes from

the Federal Government for services provided under the Federal Medicare program and

redistribute such revenue to enhance rates under New York State's Medicaid program in

contradiction of Federal regulations, which prohibit states from using Federal Medicare funds to

subsidize their Medicaid programs." (Dkt. No. 15, ¶ 317.) Defendant argues that Plaintiffs'

"Supremacy Clause claim rests on the incorrect assumption that NHQI pool funds are funneled

into DOH's general budget, to support its operations or buttress the funding for its State-operated

programs." (Dkt. No. 16-1, at 16.) Plaintiffs respond that their claim does not rely on that

assumption but instead is based on the inclusion of Medicare payments in the definition of

"revenue" for the purposes of section 2828. (Dkt. No. 17, at 18–19.)

Plaintiffs have not pointed to, and the Court is not aware of, any explicit statutory

language from Congress defining the extent to which federal Medicare or Medicaid law

preempts state law. Nor have Plaintiffs alleged that the federal government intended to

exclusively occupy the field of law—in fact, the Medicaid program expressly contemplates the

interaction between federal and state law. *See Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d

129, 134–35 (2d Cir. 2014). Thus, Plaintiffs must plausibly allege that section 2828 and its

implementing regulation "actually conflict[] with [42 C.F.R. § 433.51] . . . [so that] it is

impossible for [Plaintiffs] to comply with both state and federal requirements." *See English*, 496

U.S. at 78–79.

Section 2828 defines "revenue" to include "total operating revenue from or on behalf of

residents of the residential health care facility, government payors, or third-party payors, to pay

28

for a resident's occupancy of the residential health care facility, resident care, and the operation

of the residential health care facility as reported in the residential health care facility cost reports

submitted to the department." N.Y. Pub. Health Law § 2828(2)(a).[18] As Plaintiffs point out,

"government payers" includes payments made for residents covered by the Medicare program.

(Dkt. No. 15, ¶¶ 9, 305, 309, 317.) Recouped funds from violation of section 2828 are placed in

the NHQI pool. N.Y. Pub. Health Law § 2828(c); N.Y. Comp. Codes R. & Regs. tit. 10,

§ 415.34(e)(4).

The federal regulation on which Plaintiffs' claim relies, 42 C.F.R. § 433.51,[19] titled

"Public Funds as the State share of financial participation," reads in relevant part: "Public Funds

may be considered as the State's share in claiming [federal financial participation ('FFP')] if . . .

[t]he public funds are not Federal funds, or are Federal funds authorized by Federal law to be

used to match other Federal funds." 42 C.F.R. § 433.51(a), (c). Therein lies the disconnect in

Plaintiffs' claim: while section 2828 and its implementing regulation clearly contemplate

recoupment of funds Plaintiffs receive from the Medicare program (among other sources),[20]

Plaintiffs have not cited anything in these provisions indicating that funds that are collected from

nursing home facilities and subsequently redistributed to nursing home facilities as part of the

NHQI pool are to be included in the State's "share in claiming FFP." *See* 42 C.F.R. § 433.51(a).

---

[18] There are certain exclusions from this definition that are not relevant to this analysis. *See id.* § 2828(a)(i)–(iv).

[19] Authority for this regulation is found in 42 U.S.C. § 1302(a), and the regulation interprets and implements § 1396a(a)(2) and § 1396b(a), *see* 42 C.F.R. § 433.50(a).

[20] The Court notes that Plaintiffs elsewhere allege that "reimbursement received by nursing homes in New York from the Federal Government for the care rendered to eligible Medicare recipients is not state money and, when received, belongs to the nursing homes" and that "[f]unds received by the Plaintiffs from the . . . Medicare program[] are not trust funds but are payment for claims of services previously rendered such that once they are received, title to such funds belongs to the facilities." (Dkt. No. 15, ¶¶ 303–04.) Assuming without deciding that these allegations are correct, Plaintiffs' Medicare preemption claim would fail because once a Plaintiff accepted a payment of some sum from the Medicare program, that sum would cease to be a "Federal fund," and there would exist no violation of 42 C.F.R. § 433.51.

Case 1:21-cv-01384-BKS-CFH   Document 23   Filed 01/09/24   Page 30 of 50

Plaintiffs only put forth the conclusory allegation that "funds [Plaintiffs] receive from the federal

Medicare program for services they have rendered to eligible Medicare patients" will be used "to

enhance Medicaid rates through the NHQI quality pool," (Dkt. No. 15, ¶¶ 309, 317), without

reference to how the State actually calculates its share in claiming FFP, the role (if any) of the

redistributive NHQI pool in that calculation, and, most importantly, any part of section 2828 or

its implementing regulation that even addresses the State's "share in claiming FFP." Plaintiffs

have thus not plausibly alleged that section 2828 and its implementing regulation "actually

conflict[] with [42 C.F.R. § 433.51] . . . [so that] it is impossible for [Plaintiffs] to comply with

both state and federal requirements." *See English*, 496 U.S. at 78–79. Accordingly, Plaintiffs'

preemption claim premised on 42 C.F.R. § 433.51 is dismissed.[21]

## 2.     NLRA

Plaintiffs allege that section 2828 and its implementing regulation "selectively intrude

upon and interfere with the collective bargaining process mandated by the National Labor

Relations Act by superimposing artificial and arbitrary spending and staffing mandates on certain

nursing homes regardless of the quality of care they provide, thereby forcing those facilities to

spend money and/or hire staff over and above what is required by their collective bargaining

agreements." (Dkt. No. 15, ¶ 324.) Defendant argues that the NLRA does not preempt section

---

[21] The amended complaint expressly asserts that this claim is based on the Supremacy Clause. (Dkt. No. 15, ¶ 317 ("Section 2828 and 10 NYCRR 415.34 violate the Supremacy Clause of the U.S. Constitution . . . .").) Defendant, however, construes Plaintiffs' opposition to Defendant's motion to dismiss as "apparently abandon[ing] their preemption argument in connection with this point, arguing solely, and without authority, that distribution of funds in the NHQI pool pursuant to the Regulation violates 42 C.F.R. § 433.51." (Dkt. No. 18, at 8.) Because the cause of action alleged is based on preemption, the Court need not resolve this issue. However, the Court notes that it is not clearly established that a private right of action under Medicare or Medicaid law exists for providers to enforce the provisions of those laws. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015) ("The sheer complexity associated with enforcing § [1396a(a)(30)(A)] coupled with the express provision of an administrative remedy, § 1396c, shows that the Medicaid Act precludes private enforcement of § [1396a(a)(30)(A)] in the courts."); *Kampfer v. Nathan Littauer Hosp.*, No. 22-cv-1235, 2023 WL 4847279, at *3–4, 2023 U.S. Dist. LEXIS 130622, at *8–11 (N.D.N.Y. July 28, 2023) (collecting cases relevant to other Medicare and Medicaid regulations). The Court reiterates this point below with regard to Plaintiffs' SPA approval claim.

2828 and its implementing regulation because "section 2828 is a health-based statute, primarily directed at the care provided to nursing home residents" and "statutes establishing substantive labor standards also fall within the broad range of State regulatory authority." (Dkt. No. 16-1, at 24–26.) Plaintiffs respond that section 2828 and its implementing regulation are preempted by the NLRA because they "affect the [collective] bargaining process itself." (Dkt. No. 17, at 26–27.)

"The NLRA does not contain an express preemption provision." *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 84 (2d Cir. 2015). "Instead, '[t]he doctrine of labor law pre-emption concerns the extent to which Congress has placed implicit limits on the permissible scope of state regulation of activity touching upon labor-management relations.'" *Id.* (alteration in original) (quoting *N.Y. Tel. Co. v. N.Y. Dep't of Labor*, 440 U.S. 519, 527 (1979)). Here, Plaintiffs invoke *Machinists* preemption, which "forbids states and localities from intruding upon 'the [labor-management] bargaining process.'" *Id.* (alteration in original) (quoting *Lodge 76 Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Wis. Emp't Relations Comm'n* ("*Machinists*"), 427 U.S. 132, 149 (1976)). "Sections 7 and 8 of the NLRA guarantee employees the right to organize and engage in other forms of protected concerted action, and identify forms of unfair labor practices." *Id.* (citing 29 U.S.C. §§ 157, 158(a)-(b)). "The remaining aspects of the bargaining process are left 'to be controlled by the free play of economic forces.'" *Id.* (quoting *Machinists*, 427 U.S. at 140).

Plaintiffs argue that the Spending Mandate "impermissibly intrudes upon the labor-management bargaining process" because it "effectively strips" Plaintiffs "of the ability to ensure in advance that any negotiated collective bargaining agreement will leave it in compliance with the [Spending Mandate] once total revenue and expenses for the year are calculated . . . [and]

requires [Plaintiffs] to negotiate in the shadow of the risk that a successfully negotiated collective

bargaining agreement could nevertheless ultimately result in significant financial liability." (Dkt.

No. 17, at 27.) Plaintiffs' sole allegations to support this proposition are that Plaintiffs "will be

forced either to add staff and/or raise wages to meet" the Spending Mandate, regardless of

Plaintiffs' compliance with collective-bargaining agreements and that compliance with the

Spending Mandate "depends on factors beyond the Plaintiffs' control, including employee

staffing levels and the mix of payor sources," which "effectively forecloses the ability of

[Plaintiffs] to negotiate collective bargaining agreements that can be guaranteed to remain in

compliance with the [Spending Mandate]." (Dkt. No. 15, ¶¶ 311–12.) But Plaintiffs do not

explain why this is so. Plaintiffs point to no authority establishing that being required to spend

more on resident care—either by, as Plaintiffs point out, paying employees more or hiring more

employees—than was contemplated in previously negotiated collective-bargaining agreements

intrudes on the labor-bargaining process. Indeed, the NLRA is concerned with "establishing an

equitable *process* for determining terms and conditions of employment," but its concern does not

extend to the "particular *substantive* terms of the bargain that is struck." *See Concerned Home

Care Providers*, 783 F.3d at 85 (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724,

753 (1985)). The concerns of Plaintiffs—wages and staffing levels—are substantive terms of a

collectively bargained agreement, and regulation of those concerns "does not favor or disfavor

collective bargaining, 'eliminate particular bargaining tools,' or dictate the details of particular

contract negotiations." *See id.* at 86 (quoting *Rondout Electric, Inc. v. N.Y. Dep't of Lab.*, 335

F.3d 169 (2d Cir. 2003)); *see also Rest. L. Ctr. v. City of New York*, No. 22-491, --- F.4th ----,

2024 WL 57029, at *6, 2024 U.S. App. LEXIS 338, at *19 (2d Cir. Jan. 5, 2024) ("[T]he Second

Circuit has never applied *Machinists* to invalidate a law regulating the *substance*, rather than the *process*, of labor negotiations.").

In sum, "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption" by the NLRA. *See Concerned Home Care Providers*, 783 F.3d at 85 (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987)). This is especially true where, as here, the intended area of regulation—that is, health and, specifically, Medicaid-participant nursing homes—is one "over which Congress has granted the state a special 'measure of discretion' to craft 'programs that are responsive to the needs of [its] communities.'" *See id.* (quoting *Cmty. Health Care Ass'n of N.Y.*, 770 F.3d at 134–35). Therefore, Plaintiffs have not plausibly alleged *Machinists* preemption of section 2828 and its implementing regulation. Accordingly, Plaintiffs' NLRA preemption claim is dismissed.

### C.    Excessive Fines

Plaintiffs allege that the penalties associated with both the Spending Mandate and the Excess-Revenue Cap under section 2828 and its implementing regulation violate the Eighth Amendment's prohibition of excessive fines. (Dkt. No. 15, ¶¶ 318–20.) Defendant moves to dismiss on the grounds that: (1) Plaintiffs' excessive fines claim is unripe because Plaintiffs do not allege that any fines have actually been imposed or that Plaintiffs have availed themselves of the waiver provision of section 2828; and (2) the recoupment associated with section 2828 is remedial, not punitive, and the Excessive Fines Clause therefore does not apply. (Dkt. No. 16-1, at 18–20.) In response, Plaintiffs argue that: (1) their excessive fines claim is ripe because fines are immediately impending and will be based on past cost reports and spending; (2) waivers under section 2828 "are the exception . . . , not the rule, and are not a basis by which the Court should determine Plaintiffs' excessive fines claim premature"; and (3) the penalties associated with section 2828 are grossly disproportionate to the offense. (Dkt. No. 17, at 20–24.)

The Eighth Amendment, which applies to the states through the Fourteenth Amendment, *see Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019), protects against the imposition of "excessive fines." U.S. Const. amend. VIII. To determine whether a financial penalty is excessive under the Eighth Amendment, courts in the Second Circuit use a two-step inquiry: "First, a court must consider whether the payment or forfeiture at issue constitutes a 'fine,' meaning that it is punitive in nature and not 'purely "remedial."'" *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 194 (S.D.N.Y. 2019) (citing *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016)). "A fine may be punitive where it imposes an economic penalty on the person for that person's actions, and seeks to deter future wrongdoing." *Dorce v. City of New York*, 608 F. Supp. 3d 118, 143 (S.D.N.Y. 2022) (citing *Austin v. United States*, 509 U.S. 602, 610, 618 (1993)). "By contrast, a fine is remedial if it is 'intended only to compensate the government for lost revenue.'" *Id.* (quoting *Farina*, 409 F. Supp. 3d at 198).

"Second, a court weighs four factors to determine whether the fine is 'grossly disproportional' to the underlying offense." *Farina*, 409 F. Supp. 3d at 198 (quoting *Viloski*, 814 F.3d at 110). Factors relevant to this inquiry include:

> (1) the essence of the [underlying offense] of the [complainant] and its relation to other criminal activity, (2) whether the [complainant] fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the [complainant's] conduct.

*See Dorce*, 608 F. Supp. 3d at 143 (alterations in original) (quoting *Farina*, 409 F. Supp. 3d at 199). "Ultimately, whether a fine is excessive involves solely a proportionality determination." *Id.* (quoting *Farina*, 409 F. Supp. 3d at 194).

Before reviewing the merits, as with Plaintiffs' as-applied takings claim, the Court must first examine the ripeness of Plaintiffs' excessive fines claim. "A claim is not ripe for

adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Farina*, 409 F. Supp. 3d at 194 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Therefore, "[c]hallenges under the Excessive Fines Clause are . . . generally not ripe until the actual, or impending, imposition of the challenged fine." *See id.* at 195 (second alteration in original) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)).

Here, Plaintiffs have not alleged any amounts DOH has sought to recoup as mandated by section 2828 and its implementing regulation. Furthermore, the presence of the waiver provision of section 2828, as clarified in the implementing regulation, creates a condition on which any recoupment is contingent. *See* N.Y. Pub. Health Law § 2828(4); N.Y. Comp. Codes R. & Regs. tit. 10, § 415.34(c)(2). Plaintiffs have not alleged that they have sought and been denied waivers under those provisions. Nor do Plaintiffs allege that they have unsuccessfully attempted to seek waivers but have been otherwise hindered in those efforts. In fact, the amended complaint is silent as to the waiver provisions of section 2828 and its implementing regulation.[22] Given that "whether a fine is excessive involves solely a proportionality determination," *Dorce*, 608 F. Supp. 3d at 143 (quoting *Farina*, 409 F. Supp. 3d at 194), it is premature for the Court to examine Plaintiffs' excessive fines claim when analysis of the proportionality of any fine is dependent upon conditions the existence of which could provide a basis for a waiver under section 2828 and its implementing regulation. *See Farina*, 409 F. Supp. 3d at 195–96 (finding that "the Complaint does not allege that any fines actually have been paid by [two defendants] . . . [who] are both in the process of disputing their fines" before dismissing excessive fines claims arising from those alleged fines). For example, analysis of whether a given Plaintiff "fits

---

[22] Plaintiffs argue in their opposition to Defendant's motion to dismiss that "no waivers have been issued yet and there are real logistical issues preventing their future issuance" and conclude that waivers under section 2828 and its implementing regulation "are the exception . . . , not the rule." (Dkt. No. 17, at 21–22.) But the amended complaint, to which the Court's consideration is limited, contains no allegations relevant to that proposition.

into the class of persons for whom the statute was principally designed," *see Dorce*, 608 F. Supp. 3d at 143, may depend on whether that Plaintiff experienced an unexpected or exceptional circumstance, what actions that Plaintiff took to address such circumstances, any expenses incurred as a result of addressing such circumstances, and what preventive steps that Plaintiff is taking to ensure that such circumstances do not unexpectedly arise in the future. These are among the considerations that may qualify such a Plaintiff for a waiver. *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 415.34(c)(2). At bottom, the Court is unable to engage in the requisite proportionality analysis, rendering Plaintiffs' excessive fines claim unripe. Because Plaintiffs' excessive fines claim is unripe, it must be dismissed.

    **D.**    **Due Process and Equal Protection**

    Plaintiffs allege that section 2828 and its implementing regulation violate the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments because "they bear no rational relationship to a legitimate purpose insofar as they arbitrarily and capriciously mandate spending ratios, the taking of profits, and the reduction of staffing costs by 15% for any funds spent on contract staff, regardless of the quality of care nursing homes provide, and because, as applied, they would retroactively penalize facilities for actions taken before regulations were adopted." (Dkt. No. 15, ¶ 322.)[23] Defendant seeks dismissal of these claims on the grounds that: (1) any facial procedural due process claim fails because Plaintiffs are not entitled to any procedural due process in connection with the legislative process; (2) any as-applied procedural due process claim fails in light of section 2828's waiver requirement and the state-review process pursuant to Article 78; (3) "New York's interest in providing quality care

---

[23] Plaintiffs do not distinguish their procedural due process, substantive due process, and equal protection claims but instead assert a single claim for "Due Process, Equal Protection and Irrationality." (*Id.* at 186.)

for its nursing home residents" satisfies substantive due process requirements; and (4) Plaintiffs have failed to sufficiently allege an equal protection violation because they have not alleged membership in a suspect class, similarly situated comparators, or an intent to engage in impermissible disparate treatment. (Dkt. No. 16-1, at 21–24.) Plaintiffs respond only that section 2828 imposes penalties without regard to facility quality, and it therefore bears no rational relationship to a legitimate state purpose. (Dkt. No. 17, at 24–26.)

### 1.      Due Process

The Due Process Clause of the Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment's Due Process Clause contains both a procedural component and a substantive component. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The procedural component applies where there is an alleged deprivation by government action of a constitutionally protected interest without sufficient procedural safeguards. *Id.* The substantive component "'bar[s] certain government actions regardless of the fairness of the procedures used to implement them[]' . . . [where] 'the government's exercise of power [is] without any reasonable justification in the service of a legitimate governmental objective.'" *See Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021) (first quoting *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012), and then quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)).

### a.      Procedural Due Process

"[G]overnment action depriving a person of life, liberty, or property . . . must . . . be implemented in a fair manner." *Tsirelman v. Daines*, 19 F. Supp. 3d 438, 448 (E.D.N.Y. 2014) (quoting *Salerno*, 481 U.S. at 746), *aff'd*, 794 F.3d 310 (2d Cir. 2015). The Constitution ordinarily imposes constraints on such government action, often in the form of notice and a pre-

deprivation hearing. *See Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 427 (E.D.N.Y. 2021). "This requirement has traditionally been referred to as 'procedural due process.'" *Tsirelman*, 19 F. Supp. 3d at 448 (quoting *Salerno*, 481 U.S. at 746).

In analyzing a procedural due process claim, "a court first asks 'whether there exists a liberty or property interest of which a person has been deprived,' and if so, 'whether the procedures followed by the State were constitutionally sufficient.'" *Dean*, 527 F. Supp. 3d at 428 (quoting *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016)). In general, to determine whether there have been sufficient procedural protections, "courts rely on the test in *Mathews v. Eldridge*, weighing: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *See Tsirelman*, 19 F. Supp. 3d at 448 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

However, "[w]hen the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process[—and] [t]he challenges to such laws must be based on their substantive compatibility with constitutional guarantees." *Sibley v. Watches*, 460 F. Supp. 3d 302, 315 (W.D.N.Y. 2020) (quoting *Richmond Boro Gun Club v. City of New York*, 97 F.3d 681, 689 (2d Cir. 1996)). That is, "[p]rocedural due process has not been violated [where] plaintiffs can (and do) . . . challenge the legislative ordinance in federal or state court on the ground that it violates their substantive state or federal rights." *Richmond Boro Gun* Club, 97 F.3d at 689. This is because legislative action itself "is generally not subject to the notice and hearing requirements of the Due Process Clause,

reflecting the principle that the Constitution does not grant the public a right to be heard by governmental entities making decisions of policy." *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 353 (S.D.N.Y. 2000) (citations omitted), *aff'd*, 252 F.3d 645 (2d Cir. 2001)).

Plaintiffs only refer to procedural due process once in the amended complaint, (Dkt. No. 15, ¶ 7), and fail to specifically respond to Defendant's argument that any procedural due process claim should be dismissed, (Dkt. No. 16-1, at 23–24; Dkt. No. 17, at 24–26). To the extent Plaintiffs assert a facial procedural due process challenge, section 2828 and its implementing regulation are the result of legislative action, and therefore, the legislative process was sufficient to satisfy the strictures of procedural due process. *See Sibley*, 460 F. Supp. 3d at 315. Plaintiffs have therefore failed to state a facial procedural due process claim.

As to an as-applied procedural due process claim premised on a lack of individual process in connection with recoupment under section 2828 and its implementing regulation, for the same reasons that Plaintiffs' as-applied takings claim and as-applied excessive fines claim are unripe, Plaintiffs' as-applied procedural due process claim appears unripe. *See 835 Hinesburg Rd., LLC v. City of S. Burlington*, No. 22-cv-58, 2023 WL 2169306, at *11, 2023 U.S. Dist. LEXIS 33582, at *30–31 (D. Vt. Jan. 27, 2023) (applying the reasoning from a ripeness analysis of a takings claim to a due process claim and dismissing the due process claim as unripe), *aff'd,* No. 23-218, 2023 WL 7383146, 2023 U.S. App. LEXIS 29745 (2d Cir. Nov. 8, 2023) (summary order); *see also Kurtz*, 758 F.3d at 516 ("We conclude that . . . ripeness requirement[s] [applicable to takings claims] . . . appl[y] to all procedural due process claims arising from the same circumstances as a taking claim."). Furthermore, Plaintiffs have abandoned any procedural due process claim by failing to respond to Defendant's motion to dismiss this claim. *See Holmes v. County of Montgomery*, No. 19-cv-617, 2020 WL 1188026, at

*4, 2020 U.S. Dist. LEXIS 42906, at *10 (N.D.N.Y. Mar. 12, 2020) ("[A]t the motion to dismiss

stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address

the defendant's arguments in support of dismissing that claim." (quoting *Felix v. N.Y.S. Dep't of*

*Corr. & Cmty. Supervision*, No. 16-cv-7978, 2018 WL 3542859, at *6, 2018 U.S. Dist. LEXIS

122406, at *16 (S.D.N.Y. July 23, 2018))); *see also Garcia v. Jackson Hurst Partners LLC*, No.

18-cv-3680, 2018 WL 4922913, at *2, 2018 U.S. Dist. LEXIS 175581, at *6 (E.D.N.Y. Oct. 10,

2018) (collecting cases standing for the proposition that "when a defendant moves for dismissal

or summary judgment and the plaintiff fails to address a particular claim in their opposition

papers, it may be inferred that the plaintiff has chosen to abandon that claim"). And in any event,

Plaintiffs have failed to argue that the individual process provided by section 2828(4), under

which "the Commissioner may waive the requirements of the statute[] or exclude certain

extraordinary items from a facility's revenue or expenses on a case-by-case basis," and by the

availability of an Article 78 proceeding, as argued by Defendant, (Dkt. No. 16-1, at 24), is

insufficient. *See N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001)

("[A] procedural due process violation cannot have occurred when the governmental actor

provides apparently adequate procedural remedies and the plaintiff has not availed himself of

those remedies." (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)); *see also Chase*

*Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 153 (2d Cir. 2010) ("[In evaluating]

claims alleg[ing] procedural due process violations, [courts] . . . evaluate whether state remedies

exist because that inquiry goes to whether a constitutional violation has occurred at all." (quoting

*Rivera–Powell*, 470 F.3d at, 468 n. 12)).

   Accordingly, Plaintiffs' as-applied procedural due process claim is dismissed.

**b.    Substantive Due Process**

"To determine whether a government regulation infringes a substantive due process right," courts must first "determine whether the asserted right is fundamental." *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022), *cert. denied sub nom. Goe v. McDonald*, 143 S. Ct. 1020 (2023) (quoting *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003)). "Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Leebaert*, 332 F.3d at 140 (quoting *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460–61 (2d Cir. 1996)). When the right infringed is fundamental, courts apply strict scrutiny, and "the governmental regulation must be narrowly tailored to serve a compelling state interest." *Goe v. Zucker*, 43 F.4th at 30 (quoting *Immediato*, 73 F.3d at 460). When a "claimed right is not fundamental," courts apply rational basis review, and the "governmental regulation need only be reasonably related to a legitimate state objective." *Id.* (quoting *Immediato*, 73 F.3d at 461).

Courts review economic regulations—that is, those burdening no fundamental right but merely "adjusting the benefits and burdens of economic life"—using "the minimum scrutiny rational basis test." *See In re Chateaugay Corp.*, 53 F.3d 478, 486 (2d Cir. 1995) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976), and then citing *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83 (1978)). Under rational basis review, laws are "accorded a strong presumption of validity" and must be upheld "if there is any conceivable state of facts that could provide a rational basis" for the law. *See Heller v. Doe*, 509 U.S. 312, 319–20 (1993). "[I]t is not the state that must carry the burden to establish the public need for the law being challenged; it is up to those who attack the law to demonstrate that there is no rational connection between the challenged ordinance and the promotion of public health, safety or welfare." *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997).

Here, it is apparent that section 2828 and its implementing regulation are economic regulations that do not burden any fundamental right, and the parties do not dispute that rational basis review is applicable. (Dkt. No. 16-1, at 22–23; Dkt. No. 17, at 24–25.) Furthermore, the parties do not appear to dispute that section 2828 and its implementing regulation are aimed at a legitimate state objective. As Plaintiffs readily state in their opposition to Defendant's motion, "[t]he goal of these minimum spending requirements is to help ensure a high quality of resident care." (Dkt. No. 17, at 23 (quoting 44 N.Y. Reg. 24–25 (Aug. 10, 2022)).) Plaintiffs allege that section 2828 and its implementing regulation—including both the Spending Mandate and the Excess-Revenue Cap—"arbitrarily and capriciously mandate spending ratios, the taking of profits, and the reduction of staffing costs by 15% for any funds spent on contract staff, regardless of the quality of care nursing homes provide." (Dkt. No. 15, ¶ 322.) Plaintiffs further allege that section 2828 and its implementing regulation "impos[e] penalties without regard to facility quality" and that the penalties therefore "bear no rational relationship to quality of care." (*Id.* ¶ 322.) The Court thus construes Plaintiffs' allegations as asserting that section 2828 is not reasonably related to the objective of ensuring a high quality of resident care.

But the State determined that "[r]equiring nursing homes to spend an appropriate amount of revenue on the direct care of residents and resident-facing staffing will reduce errors, complications, and adverse resident care incidents[,] [and] [i]t will also improve the safety and quality of life for all long-term care residents in New York State." 44 N.Y. Reg. 25 (Aug. 10, 2022). Capping profit, and therefore encouraging the reinvestment of revenue, could serve the same purpose.[24] And "it is not the role of the courts to second-guess the wisdom or logic of the

---

[24] "A court is not confined to the particular rational or irrational purposes that may have been raised in the pleadings," *Progressive Credit Union v. City of New York*, 889 F.3d 40, 50 (2d Cir. 2018), and "may hypothesize a legitimate, rational governmental purpose," *Johnson v. Baker*, 108 F.3d 10, 11–12 (2d Cir. 1997).

State's decision" to regulate nursing homes in a manner Plaintiffs find objectionable. *See Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 285 (2d Cir. 2015). Thus, given that laws are "accorded a strong presumption of validity" and that the State's asserted justification is a "conceivable state of facts that . . . provide[s] a rational basis" for the law, *see Heller*, 509 U.S. at 319–20, the Court finds that Plaintiffs have failed to plausibly allege that section 2828 and its implementing regulation are not reasonably related to a legitimate state objective.

Moreover, to the extent Plaintiffs seek to raise a substantive due process claim based on the alleged retroactivity of section 2828, it is dismissed because Plaintiffs' opposition to Defendant's motion to dismiss Plaintiffs' substantive due process claim is silent as to this claim. *See Holmes*, 2020 WL 1188026, at *4, 2020 U.S. Dist. LEXIS 42906, at *10; *Garcia*, 2018 WL 4922913, at *2, 2018 U.S. Dist. LEXIS 175581, at *6.

A law is retroactive only where it "attaches new legal consequences to events completed before its enactment." *See Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 (1994). Where a statute obligates an agency to promulgate regulations, and private legal obligations inhere in the regulations rather than in the statute itself, such legal obligations are not in effect until the adoption of the regulations. *See Sweet v. Sheahan*, 235 F.3d 80, 86–87 (2d Cir. 2000). Thus, applicability of the legal obligations created by such a regulation to a date before adoption of the regulation is necessarily retroactive. *See id.* at 88. Here, it is not clear that the legal consequences at issue—that is, the relinquishment of funds not spent in compliance with the Spending Mandate and Excess-Revenue Cap—arose with the adoption of the implementing regulation as opposed to the initial enactment of section 2828 in 2021, *see* S.2507C, 204th Leg., 2021–22 Legis. Sess. (N.Y. 2021). And in any event, a statute or regulation with retroactive effect is not impermissible under the strictures of substantive due process merely because of its retroactivity. *See*

*Chateaugay*, 53 F.3d at 489 ("[I]t is . . . clear that the presence of some retroactivity in no way alters our deferential standards of review.") Rather, as with ordinary substantive due process claims, substantive due process claims based on retroactivity implicate rational basis review. *See id.* at 489–91. As discussed above, section 2828 and its implementing regulation are reasonably related to a legitimate state objective in satisfaction of rational basis review. Having failed to provide any argument in support of a substantive due process claim based on retroactivity, Plaintiffs' substantive due process claim is dismissed.

### 2. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "[T]he prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class." *Id.* Where a plaintiff does not allege membership in a protected class or group, they may nevertheless state an equal protection claim by alleging that either they were discriminated against as "class of one" or the laws were selectively enforced against them for impermissible reasons. *See Missere v. Gross*, 826 F. Supp. 2d 542, 560 (S.D.N.Y. 2011); *see also Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).[25] "To prevail under either theory of Equal Protection, a plaintiff must specify at least one instance in which he was treated differently from another similarly

---

[25] Plaintiffs do not allege membership in a vulnerable or otherwise suspect class. Thus, their equal protection claim must be based on either a class-of-one or selective-enforcement theory. *See Missere*, 826 F. Supp. 2d at 560. Plaintiffs do not identify upon which of these theories they assert their equal protection claim.

situated." *Hu v. City of New York*, 927 F.3d 81, 101 (2d Cir. 2019). Dismissal is appropriate

where a plaintiff fails to allege any similarly situated comparators. *See Ruston v. Town Bd. for

Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010); *Hu*, 927 F.3d at 101.

### a.      Class of One

To state a "class-of-one" equal protection claim, a plaintiff must plausibly allege that they

were "intentionally treated differently from others similarly situated and that there is no rational

basis for the difference in treatment." *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000). This requires a plaintiff to establish: "that (i) no rational person could regard the

circumstances of the plaintiff to differ from those of a comparator to a degree that would justify

the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in

circumstances and difference in treatment are sufficient to exclude the possibility that the

defendants acted on the basis of a mistake." *Progressive Credit Union*, 889 F.3d at 49 (quoting

*Ruston*, 610 F.3d at 59–60).

To prevail on such a claim, a plaintiff "must show an extremely high degree of similarity

between themselves and the persons to whom they compare themselves." *Progressive Credit

Union*, 889 F.3d at 49 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).

Plaintiffs must be "prima facie identical" to the comparators because this comparison provides

an inference that the difference in treatment "lack[s] any reasonable nexus with a legitimate

governmental policy." *Id.* (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005),

*overruled on other grounds*, *Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008)).

As with a court's rational-basis review under the Due Process Clause, there is "a strong

presumption of validity" when a plaintiff that does not allege membership in a protected class

brings a class-of-one claim, and "those attacking the rationality of the legislative classification

have the burden to negative every conceivable basis which might support it." *See Progressive Credit Union*, 889 F.3d at 49 (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993)).

Here, Plaintiffs' allegations describing comparators are limited to a single reference to "facilities that do meet the 70% / 40% spending mandates, but fail to meet the standards as quality providers." (Dkt. No. 15, ¶ 307.) In their opposition to Defendant's motion to dismiss, Plaintiffs describe these comparators as "other facilities rated as low-quality by the State [that] will be completely unaffected" by section 2828. (Dkt. No. 17, at 25.) But the amended complaint contains no specific allegations related to these "other facilities"—let alone allegations that establish the "other facilities" are prima facie identical to Plaintiffs.[26] Therefore, dismissal is appropriate. *See Ruston*, 610 F.3d at 59; *Hu*, 927 F.3d at 101.

However, even if the "other facilities" were similarly situated comparators, the Court, in disposing of Plaintiffs' substantive due process claim, determined that the State's asserted justification underlying section 2828 demonstrated a "conceivable state of facts that . . . [that] provide[s] a rational basis" for the law. *See Heller*, 509 U.S. at 319–20. Here, Plaintiffs have not plausibly alleged that the State's differing regulatory treatment of those who spend and earn in accordance with section 2828 as compared to those who do not lacks a rational basis, especially given the strong presumption of the validity of section 2828. *See Progressive Credit Union*, 889 F.3d at 50–51.

Therefore, Plaintiffs have not plausibly stated a class-of-one claim and Plaintiffs' equal protection claim is dismissed to the extent it is premised on a class-of-one theory.

---

[26] Furthermore, the Court notes that nursing-home Plaintiffs include facilities that are ranked in each of the five quintiles under the NHQI program and each of the five star categories under the CMS program, and some Plaintiffs from each of those categories would not have faced recoupment in either 2019 or 2020 (that is, some Plaintiffs from each of the categories were in compliance with the Spending Mandate or the Excess-Revenue Cap in 2019 or 2020), suggesting that the comparators Plaintiffs describe are themselves Plaintiffs in this action. (Dkt. No. 15-1.)

b.       **Selective Enforcement**

To state an equal protection claim under a selective-enforcement theory, a plaintiff must allege: (1) that they were "treated differently from another similarly situated comparator"; and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu*, 927 F.3d at 95 (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)); *see also LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980). Although both class-of-one claims and selective-enforcement claims require a showing that a plaintiff was treated differently from similarly situated comparators, "a lower similarity standard applies" to selective-enforcement claims: selective-enforcement claims require only a "'reasonably close resemblance' between a plaintiff's and comparator's circumstances." *See Hu*, 927 F.3d at 91, 93.

As noted, Plaintiffs have not plausibly alleged facts as to relevant comparators. This is true even given the lower similarity standard applicable to selective-enforcement claims. *See Hu*, 927 F.3d at 91, 93. Thus, Plaintiffs have failed to state a selective-enforcement claim. *See id.* at 101. Moreover, the amended complaint contains no allegations plausibly suggesting that Defendant exhibited a "malicious or bad faith intent to injure" Plaintiffs. *See Harlen Assocs.*, 273 F.3d at 499, 502.[27] Indeed, the amended complaint is silent as to the Defendant's intent.[28]

---

[27] Nor does the amended complaint contain any allegations suggesting that section 2828 discriminates based on impermissible considerations such as race, religion, or an intent to inhibit or punish the exercise of constitutional rights. *See Harlen Assocs.*, 273 F.3d at 499.

[28] In fact, as previously discussed, Plaintiffs state in their opposition to Defendant's motion to dismiss that the purpose of section 2828 is "to improve the safety and quality of life for all long-term care residents in New York State." (Dkt. No. 17, at 23 (quoting 44 N.Y. Reg. 25 (Aug. 10, 2022)).)

Therefore, Plaintiffs have not plausibly stated a selective-enforcement claim. Accordingly, Plaintiffs' equal protection claim is dismissed to the extent it is premised on a selective-enforcement theory.

### E.      SPA Approval

Plaintiffs' sixth claim arises from Defendant's alleged failure to obtain approval from CMS of an amendment to New York's Medicaid plan. (Dkt. No. 15, ¶¶ 325–26.) Defendant argues that the DOH has authority to proceed with section 2828 and its implementing regulation pending CMS's approval of the SPA and that "[h]ealth care providers 'lack a private right of action to enforce the requirement of federal approval of state plan amendments.'" (Dkt. No. 16-1, at 27–28 (quoting *N.J. Primary Care Ass'n Inc. v. N.J. Dep't of Hum. Servs.*, 722 F.3d 527, 539 (3d Cir. 2013).) In response, Plaintiffs argue that whether healthcare providers have a private right of action to challenge a state's failure to obtain approval of an SPA prior to enacting "[m]aterial changes . . . in the State's operation of the Medicaid program" is an open question in the Second Circuit. (Dkt. No. 17, at 28 (quoting 42 C.F.R. § 430.12(c)(ii)).)

As discussed, "Medicaid is a cooperative federal–state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). Medicaid is jointly financed by federal and state governments, but it is administered entirely by the states. *N.J. Primary Care Ass'n*, 722 F.3d at 529. While states need not participate in Medicaid, if they choose to do so, "they must implement and operate Medicaid programs that comply with detailed federally mandated standards," which include the submission of "a plan detailing how the State will expend its funds." *See Cmty. Health Care Ass'n of N.Y.*, 770 F.3d at 135 (first quoting *Three Lower Cnties. Comm. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 297 (4th Cir. 2007), and then quoting *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002)). For the

federal government—through CMS—to approve a state plan, the plan must "describ[e] the nature and scope of [the State's] Medicaid program and giv[e] assurance that it will be administered in conformity with the specific requirements of [federal law]." *See* 42 C.F.R. § 430.10. "State plans must be amended whenever necessary to reflect changes in the federal law or '[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program.'" *N.J. Primary Care Ass'n*, 722 F.3d at 529 (quoting 42 C.F.R. § 430.12(c)(ii)). If CMS determines that a state plan or plan amendment does not comply with federal law, it may deny the state federal Medicaid funds. 42 C.F.R. §§ 430.15(c), 430.18.

Here, Plaintiffs allege that Defendant filed a proposed SPA on June 30, 2022,[29] retroactive to April 1, 2022, which CMS has not approved or denied.[30] (Dkt. No. 15, ¶¶ 14–15); *see also* N.Y. Comp. Codes R. & Regs. tit. 10, § 415.34(e)(1)(ii).

As an initial matter, while it is not settled in the Second Circuit that healthcare providers lack a private right of action to enforce the requirement of federal approval of SPAs, "there likely is no such cause of action," *Cmty. Health Care Ass'n of N.Y.*, 770 F.3d at 148 n.2; *see also N.J. Primary Care Ass'n*, 722 F.3d at 538–39; *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 547–49 (9th Cir. 2011). But if a private right of action exists for healthcare providers to enforce federal requirements of SPAs, Plaintiffs have not plausibly alleged that Defendant's proposed SPA fails to comply with federal law, which, in relevant part, provides that:

---

[29] This demonstrates Defendant's compliance with section 2828(5), which requires that Defendant "seek amendments to the state plan for medical assistance," N.Y. Pub. Health Law § 2828(5).

[30] Plaintiffs have not alleged that CMS responded in any way to the proposed amendment. If CMS did not, it appears that the amendment may have been approved because a "plan amendment will be considered approved unless CMS, within 90 days after receipt of the plan or plan amendment in the regional office, sends the State . . . [w]ritten notice of disapproval; or . . . [w]ritten notice of any additional information it needs in order to make a final determination." 42 C.F.R. § 430.16; *see also* 42 C.F.R. § 447.256(b) ("If CMS does not send a notice to the agency of its determination within this time limit and the provisions in paragraph (a) of this section are met, the assurances and/or the State plan amendment will be deemed accepted and approved."). Neither party addresses this issue.

> A . . . plan amendment takes effect on the day specified in the . . . plan amendment . . . . [But] [a] State plan amendment that takes effect prior to submission of the amendment to CMS may remain in effect only until the end of the State fiscal year in which the State makes it effective, or, if later, the end of the 90-day period following the date on which the State makes it effective, unless the State submits the amendment to CMS for approval before the end of that State fiscal year or that 90-day period.

42 C.F.R. § 457.65(a)(1), (3). Because the proposed amendment took effect April 1, 2022, and Defendant submitted the proposed amendment to CMS within ninety days of the effective date, the effectiveness of the amendment was not limited to either a ninety-day period or the end of New York's fiscal year. *See id.* § 457.65(a)(3). Rather, the amendment was allowed to take effect on April 1, 2022, and Plaintiffs have not suggested that its effectiveness was otherwise limited. *See id.* § 457.65(a)(1). Accordingly, Defendant's motion to dismiss is granted with respect to Plaintiffs' claim arising from Defendant's alleged failure to obtain approval from CMS of an SPA to New York's Medicaid plan.

## V.  CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss, (Dkt. No. 16), is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' as-applied takings, as-applied excessive fines, and as-applied procedural due process claims are **DISMISSED as unripe without prejudice** to filing an amended complaint if these claims become ripe; and it is further

**ORDERED** that the amended complaint, (Dkt. No. 15), is otherwise **DISMISSED**; and the Clerk is directed to issue a judgment and close this case.

**IT IS SO ORDERED.**

Dated: <u>January 9, 2024</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge